McSorley *v.* Pennsylvania Turnpike Commission.

Torrance *v.* Pennsylvania Turnpike Commission.

Argued April 17, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD and JONES, JJ.

82

*James H. Booser*, with him *Samuel A. Schrecken-gaust, Jr.*, *Sterling G. McNees*, and *McNees, Wallace & Nurick*, and *Harold E. McCamey*, and *Dickie, Mc-Camey, Chilcote, Reif & Robinson*, for plaintiff, G. Franklin McSorley.

*Ernest S. Burch*, with him *James H. Stewart, Jr.*, and *Nauman, Smith, Shissler & Hall* for plaintiff, James F. Torrance.

*Thomas D. McBride*, Attorney General, with him *Joseph L. Donnelly*, Deputy Attorney General, *Henry E. Harner*, General Counsel, Pennsylvania Turnpike Commission, and *Charles H. Stone*, Legal Assistant, for defendants.

OPINION BY MR. CHIEF JUSTICE JONES, June 28, 1957:

These two actions in mandamus are before us on original jurisdiction. The proceedings were instituted in the Court of Common Pleas of Dauphin County by the respective plaintiffs each of whom is a member of the Pennsylvania Turnpike Commission which, with the three other members of the Commission, are the defendants. After the complaints and answers had been filed, the plaintiffs requested us by petition (joined in by the Attorney General as counsel for the defendants) to certiorari the records for our original and final disposition. At the same time the one plaintiff and the defendants filed of record a stipulation of all material facts, the stipulation being in lieu of the pleadings theretofore filed. The other case is here on the plead-

ings, but none of the material facts is disputed. Because of the public importance of the issue involved and the desirability of a conclusive decision at the earliest possible date, special certiorari were issued, and the cases have been argued before us. The legal question involved is the same in both cases and will be dealt with in this one opinion. It arose out of the following circumstances.

The plaintiffs, James F. Torrance and G. Franklin McSorley, were duly appointed and confirmed as members of the Pennsylvania Turnpike Commission for terms expiring respectively on June 4, 1957, and June 4, 1963. Presentments having been made by a special grand jury, which had investigated the administration of the affairs of the Pennsylvania Turnpike Commission, the regular grand jury for Dauphin County for the January Session 1957, on the basis of the presentments and evidence presented before it, returned true bills of indictment on January 23, 1957, against the plaintiffs, inter alia, charging James F. Torrance with willful misbehavior in his office as a Commissioner of the Pennsylvania Turnpike Commission and with criminal conspiracy to defraud the Commission and G. Franklin McSorley with willful misbehavior in his office as Commissioner.

On January 25, 1957, the Governor addressed to each, Torrance and McSorley, an identic letter wherein he stated that, inasmuch as the grand jury of Dauphin County had found true bills of indictment against them, he believed it proper for them to stand aside from their duties as members of the Pennsylvania Turnpike Commission and that accordingly, acting under the powers vested in him as Governor of the Commonwealth, he thereby suspended them from such duties, without pay, effective at the close of business January 30, 1957, until the charges against them are

decided in the courts. On and after January 31, 1957, the three remaining members of the Commission, acting on the authority of the Governor's order of suspension, excluded the plaintiffs from all meetings of the Commission and divested them of all authority to perform any official acts for or on behalf of the Commission as members thereof. Thereupon, the plaintiffs instituted the actions now before us seeking, thereby, judgments requiring the defendants to accord to them the duties, rights, privileges and emoluments of Commissioners of the Pennsylvania Turnpike Commission and for their unpaid salaries from January 31, 1957.

The plaintiffs contend that the Governor lacks power to suspend a member of the Pennsylvania Turnpike Commission in the circumstances here obtaining, basing their contention principally, if not solely, on our decision in *Watson v. Pennsylvania Turnpike Commission*, 386 Pa. 117, 125 A. 2d 354. It is evident that the plaintiffs seriously misapprehend what was before us for decision in the *Watson* case and what we there decided.

After reciting the material facts in the *Watson* case, we stated the matter for decision as follows: "The sole question involved is whether the Governor had the power under the Constitution and laws of the Commonwealth to remove from office, *at his pleasure,* a member of the Pennsylvania Turnpike Commission during the fixed term of office for which he was appointed and confirmed" (Emphasis supplied). Watson himself, as plaintiff, posed the question thusly,—"did the Governor of Pennsylvania have the power to remove him from office *without cause,* prior to the expiration of plaintiff's term of office?" (Emphasis supplied). Throughout his brief, Watson's attack on his removal from office was uniformly restricted to the fact that the Governor's action in the premises was taken "at his

pleasure" and *not* for cause. And, in the oral argument of counsel for the plaintiff, it was implicit, and understandably so, that a removal by the Governor of a Turnpike Commissioner *for cause* would present quite a different question. Our decision in the *Watson* case was, therefore, consonantly limited to the holding that, although the Turnpike Commissioners are *appointed* by the Governor pursuant to the Act of May 21, 1937, P.L. 774, "the Act expressly and definitely annexed conditions to the tenure of the four appointed members of the Commission (the Secretary of Highways is ex officio the fifth member) with the result that they are not removable *at the pleasure* of the Governor under the power conferred on him by Article VI, Section 4, of the Constitution" (Emphasis supplied).

It is clear that the plaintiffs' present contention is based upon a disregard of the restricted scope of our ruling in the *Watson* case and, if adopted, would place limitations upon the Governor's power and duty under Article VI, Section 4, of the Constitution which would operate to nullify the plain and necessary intendment of the Constitution.

Article VI, Section 4, in addition to ordaining that all officers "shall be removed on conviction of misbehavior in office or of any infamous crime", expressly provides that "*Appointed* officers . . . may be removed at the pleasure of the power by which they shall have been appointed" and that "All officers *elected* by the people . . . shall be removed by the Governor *for reasonable cause,* . . . on the address of two-thirds of the Senate" (Emphasis supplied). Thus, it is at once evident that while the removal of an *elected* officer *for reasonable cause* is expressly provided for by the Constitution, the power to remove an *appointed* officer for reasonable cause is necessarily to be inferred from the appointer's authority to remove an appointee at

his pleasure. Stated otherwise, the constitutional provision comprehends removal of an appointee for cause as coming within the appointor's broad power in the premises. If that were not so, then there is no constitutional provision for the removal of an appointed officer for cause although an elected officer may be so removed. Such a patently anomalous eventuality could result only from specious reasoning on the intent of the germane provisions of the Constitution.

The initial enjoinder of Article VI, Section 4, is that "All officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime." The latter clause has been held to be self-executing: *Commonwealth v. Davis,* 299 Pa. 276, 279, 149 A. 176. It logically follows that if officers do not behave themselves well while in office, they are removable for cause. If their blamable conduct proves sufficient to convict them of misbehavior in office or any infamous crime, they are automatically removed by virtue of the self-executing provision of Article VI, Section 4, hereinabove quoted, but, until then, they are removable for cause in like connection at the pleasure of the appointor. The power to remove an appointee for cause, which is clearly implied in Article VI, Section 4, is all the more indicated when the Governor happens to be the appointor since, by Article IV, Section 2, of the Constitution, he is expressly invested with the "supreme executive power" of the Commonwealth and is specifically charged to "take care that the laws be faithfully executed. . . ."

For what reason, then, would it be suggested that the Governor's power to remove a Turnpike Commissioner for cause has been inhibited? Only that in the *Watson* case, supra, we deduced a legislative intent from the Pennsylvania Turnpike Act of May 21, 1937,

P.L. 774, that the terms for which Commissioners were appointed and confirmed were not to be foreshortened by the Governor without cause, i.e., merely at his whim or personal desire. We did not, however, deduce any legislative intent from the conditions annexed by the Act of 1937, supra, to the tenure of the four appointed Commissioners that they were to be immune from removal for cause and thus be elevated to a status superior to all other appointed officers. The Governor's power and duty to remove an appointed officer for cause stems from the constitutional provisions to which reference has been made hereinabove. It is questionable, indeed, whether the legislature could constitutionally impose any restraint on the Governor's power to remove an appointee *for cause* in any instance (compare *Bowman's Case,* 225 Pa. 364, 74 A. 203) which it did not attempt to do by the Turnpike Commission Act of 1937, supra.

The power of the Governor to remove an appointee for cause embraces the power *to suspend* for cause; the greater implies the less. Indeed, we recently had occasion to recognize that a public school superintendant possesses *inherent* power to suspend a teacher for cause even though the superintendent was admittedly without power to remove the teacher: see *Kaplan v. Philadelphia School District,* 388 Pa. 213, 130 A. 2d 672. While there was a division of opinion in this court on the main question involved in the *Kaplan* case, we were unanimous that a superintendent of schools possesses the *inherent* power to suspend for cause a teacher who had tenure guaranteed him under a written contract with the School District. The Superior Court was likewise unanimously of the same opinion in the *Kaplan* case as was also the court below. Surely the Governor, who is invested with the supreme executive power of the Commonwealth, is not less qualified to suspend an

appointee for cause especially when action to that end is not otherwise provided for by law.

In any instance where cause is the basis for the Governor's action, whether it be removal or suspension that is indicated, it must depend upon the seriousness of the justification for the action. While no inference of guilt is to be drawn from the mere fact of the indictments against the plaintiffs, who will remain clothed with a presumption of innocence until their guilt is established, nevertheless the indictments do furnish probable cause for the Governor's belief that the plaintiffs have been guilty of wrongdoing in their offices which is sufficient to constitute just cause for suspending them from the duties of their offices until the charges against them are decided in the courts. The justification for the suspension of an appointed officer, not subject to removal without cause (i.e., a Turnpike Commissioner), must, of course, be substantial and not an offense consisting of a mere *malum prohibitum*. Article VI, Section 4, supplies the appropriate definition. The offense must be such that, if proven, will constitute guilt of misbehavior in office or any infamous crime for which, upon conviction, the offender would be removable from office automatically.

A brief for one of the plaintiffs cites the debates of the Constitutional Convention of 1873 (Vol. 3, p. 233) in an effort to prove that it was not the delegates' intention in Article VI, Section 4, of the Constitution to confer upon the Governor any power to suspend an officer temporarily. It is at once evident, however, upon reference to the cited colloquy, that what the delegates had in mind were *elected* officers. Thus, delegate Curtin's inquiry about the Governor's power to suspend officers of the State temporarily specifically mentioned the Auditor General and State Treasurer in identifying officers contemplated by his question. And,

under the applicable rule of *ejusdem generis* his descriptive inclusion of "any other officer" could mean only such as the Auditor General or State Treasurer, i.e., *elected officers*. It would do violence to the words employed to infer anything more. Of course, Article VI, Section 4, did not confer upon the Governor power to suspend *elected* officers. His power with respect to such is to remove them for reasonable cause on the address of two-thirds of the Senate. As to appointed officers, the power of the appointor under Article VI, Section 4, to remove appointees at his pleasure embraces at all times the power to remove for reasonable cause, as well, and that power includes the right to suspend for cause, as we have already seen.

The brief for the other plaintiff argues that, if the power to suspend a Commissioner for cause is accorded the Governor, he could by suspensions deprive the Commission of a quorum of active members and thus cause a breakdown of the Commission. The apprehension is, of course, speculative, where, as here, the question is whether two members of the Commission under formal charges of misbehavior in their offices should be required to stand aside from participation in the affairs of the Commission until the charges have been judicially disposed of. In any event, the law will not be found powerless to protect, manage and operate the properties of the Turnpike Commission, pending suspension of Commissioners, if the number suspended should at any time be such as to deprive the Commission of a quorum of its members—a situation with which we are not now confronted. See, e.g., *Dalzell v. Kane*, 321 Pa. 120, 123, 183 A. 782. It would indeed be strange if a possibly corrupt administration of a governmental agency, whereof there is probable cause for belief, could become so augmented in number of offenders as to render the appointor of the administra-

tors helpless to take appropriate steps to insure against harm to the public.

The several complaints are dismissed at the costs of the respective plaintiffs.

Mr. Justice Cohen took no part in the consideration or decision of these cases.

———

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE BELL:

The problems raised in these appeals are novel and difficult. The majority hold that the Governor of Pennsylvania has *a Constitutional* right to remove for cause—and consequently to suspend for cause—a member of the Pennsylvania Turnpike Commission although admittedly he has no power to remove for pleasure or for any of the other causes enumerated in the Constitution. I disagree with the basic reasoning of the majority. Neither the Constitution nor any statute pertaining to the Turnpike Commission nor any other statute gives the Governor of Pennsylvania *the right to remove or suspend* a member of the Turnpike Commission "at pleasure", or for any cause whatsoever except after impeachment or conviction. Moreover the Constitution and the pertinent statute impliedly, though clearly, negate such power. The Turnpike Commission was created not by the Constitution but by the Legislature* and in accordance with Article XII, Section 1, of the Constitution, it had a right to prescribe the terms and conditions of appointment, the term of service, and the terms, conditions and limita-

———

* Act of May 21, 1937, P.L. 774, No. 211, §4, 36 PS 652d.

tions of appointment and removal.* It delegated to the Governor a *limited* power of appointment, namely, a power of appointment for a term of ten years by and with the advice and consent of the Senate; and it gave him no power of removal or suspension during that term. The Act did not specifically state how, when or by whom a Commissioner could be removed, although it is obvious that it was not the intention of the Legislature to permit removal by a Governor, one day or one month or one year, or several years after the appointment, for that would make the fixing of a ten year term or tenure of office by the Legislature (in conjunction with an appointment by and with the advice and consent of the Senate) both meaningless and ridiculous.

### Article VI, Section 4.

The majority base the Governor's power of *removal for cause* upon Article VI, §4, of the Constitution. Article VI, §4 not only does not give a power of removal of such appointed officers for "cause", but by enumerating *specific* grounds for removal,—including a *specific* clause for removal "for reasonable cause" with the approval of two-thirds of the Senate—it *clearly indicated that no other grounds would suffice.* Article VI provides in §1, §2 and §3 for impeachment of the Governor and all other civil officers for any misdemeanor in office. Section 4, which must be read in conjunction with the other sections of Article VI and with other Articles of the Constitution, provides: "*All* officers shall hold offices on the condition that they behave themselves well while in office and *shall be re-*

---

* *Watson v. Pennsylvania Turnpike Commission*, 386 Pa., infra; *Marshall Impeachment Case*, 360 Pa., infra; *Milford Township Supervisors' Removal*, 291 Pa., infra; *Com. ex rel. Bunch v. Beattie*, 364 Pa. 572, 73 A. 2d 664; *Weiss v. Ziegler*, 327 Pa., infra.

*moved on conviction** of misbehavior in office or any infamous crime. Appointed officers, other than judges of the courts of record . . . may be removed at the pleasure of the power by which they shall have been appointed. All officers elected by the people [with certain specified exceptions] shall be removed by the Governor *for reasonable cause* after due notice and full hearing on the address of two-thirds of the Senate." Article XII, §1 of the Constitution, which must be considered and interpreted in conjunction with Article VI, §4, provides: "All officers whose selection is not provided for in this Constitution shall be elected or appointed as may be directed by law. . . ."

It is clear from Article VI, §4, in conjunction with Article XII, §1, that (1) elected officers, with certain exceptions, shall be removed by the Governor *only for reasonable cause* and then only with the approval of two-thirds of the Senate; (2) that *all* officers shall be removed on *conviction* of misbehavior in office or any infamous crime; (3) that appointed officers (with certain specified exceptions) may be removed at the pleasure of the power by which they shall have been appointed, if the law creating the office does not expressly or impliedly otherwise provide. This last provision (3), even if it be considered alone and not in conjunction, as it must be, with (1) and (2), has proven difficult to interpret. It is difficult, if not impossible, to reconcile all the cases which have interpreted this particular provision because either (a) they have overlooked the above mentioned provision number (1) and particularly number (2) which provides for *removal on conviction,* and (b) later cases adopted interpretations which are apparently at variance with prior decision which they often failed to overrule or distinguish, and (c) recent

---

* Italics throughout, ours.

cases* adopted a test of whether the duties of the appointed officers were principally legislative or principally (executive or) administrative.** Ofttimes the duties of the officers in question were both legislative and administrative, so that on the basis of such a test it is frequently very difficult to determine who is the appointing power and what, if any, limitations have been fixed by the Legislature—hence the confusion.

### 1. Power of Removal at Pleasure.

The Governor is empowered, if he be the appointing officer, within the meaning of Article VI, §4, and Article XII, §1, to remove his appointee for pleasure. In such a case, the Governor has the right and power to remove or suspend his appointee at pleasure and of course this may be for any whim or cause whatsoever since the greater includes the less. The first question that arises, therefore, is whether a Turnpike Commissioner may be removed by the Governor at his pleasure—if so, reasonable cause is immaterial and unnecessary.

This question was squarely raised in the recent case of *Watson v. Pennsylvania Turnpike Commission*, 386 Pa. 117, 125 A. 2d 354, where this Court, after referring to Article XII, §1, and citing several cases, said (pages 123-124):

". . . And, in Marshall Impeachment Case, 360 Pa. 304, 309-310, 62 A. 2d 30, Chief Justice MAXEY said with reference to the Milford Township case, 'we held that if an office is the creature of the Legislature, the

---

* Until *Watson v. Pennsylvania Turnpike Commission*, 386 Pa., infra.

** Cf. *Com. ex rel. Attorney General v. Benn*, 284 Pa. 421, 131 A. 253; *Milford Township Supervisors' Removal*, 291 Pa. 46, 139 A. 623; *Watson v. Pennsylvania Turnpike Commission*, 386 Pa. 117, 125-128, 125 A. 2d 354.

latter can establish a method for the incumbent's removal.' ...

"It is therefore established in this State beyond respectable controversy that, where the legislature creates a public office, it may impose such terms and limitations *with reference to the tenure or removal** of an incumbent as it sees fit. There is nothing in the Constitution prohibiting such action while, on the other hand, Article XII, Section 1, expressly admits of it. Of course, where the legislature, in creating a public office, imposes no terms or limitations on the duration of an incumbent's tenure or the mode of his removal, the method of removal prescribed by Article VI, Section 4, of the Constitution applies: See Marshall Impeachment Case, supra, and Commonwealth v. Beattie, supra.

"The question, then, as to whether the tenure or removal of an appointee of a legislatively created office has been so conditioned by the legislature as to exempt the incumbent from removal by the Governor at his pleasure, under his constitutional power, *is one of intent to be gleaned from the statute creating or regulating the office.*"

The Court then held—and the majority opinion in the instant case admits—that Watson, who was appointed a member of the Turnpike Commission by the Governor for a term of ten years and confirmed by the Senate, *could not be removed*—under the Constitution or the Act of the Legislature—*at the pleasure of the Governor*. It is clear that the Watson decision was necessarily predicated upon the premise that the Act showed an intention on the part of the Legislature to limit the Governor's power of removal to the other

---

* Also *Milford Township Supervisors' Removal*, 291 Pa. 46, 139 A. 623; *Weiss v. Ziegler*, 327 Pa. 100, 193 A. 642.

causes specifically authorized in Article VI, §4, i.e. after conviction of misdemeanor in office or any infamous crime; and this legislative intent was manifest from the annexing of a ten year term* plus the requirement of confirmation by the Senate.**

  2. Power of Removal for Reasonable Cause.

    (a) Under the Constitution.

Since the Governor could not remove Watson or any Turnpike Commissioner *for pleasure,* we must examine the balance of §4 to ascertain whether the Governor is given any other relevant power of removal.

Section 4 of Article VI further specifically provides that "All [non-elective] officers . . . shall be removed *on conviction* of misbehavior in office or of any infamous crime", and "All officers elected . . . shall be removed by the Governor *for reasonable cause,* after . . . full hearing, on the address of two-thirds of the Senate." Of course, neither Torrance nor McSorley are elected officers; they have not been convicted of misbehavior in office or of any infamous crime. *It is therefore clear and indisputable that neither Torrance nor McSorley could be removed for any cause enumerated or mentioned in Section 4.*

It follows as day follows night and night follows day that these provisions of Section 4 of the Constitution which specify the causes for which the Governor may remove officers, *give him no right or power of removal for any cause except those enumerated therein.*

---

 * A fortiori if the ten year terms are staggered.

 ** The Court did not discuss the important question of whether the Governor is the sole or only part of the appointing power. The Governor is utterly powerless to appoint (except temporarily when the Senate is not in session) a member of the Turnpike Commission—he can only nominate and his nominee becomes an actual and valid appointment only if the nomination is advised and consented to by two-thirds of the Senate.

Since the majority derive a right or power of suspension for reasonable cause from a *non-existent* Constitutional power of removal for reasonable cause, it is obvious that no Constitutional power of suspension for reasonable cause exists under Article VI, §4.

(b) Under the Act creating and regulating the Turnpike Commission.

The language of the legislative Act will be searched in vain for authority to remove or suspend a Turnpike Commissioner—indeed the Act by its language and terms clearly negates such a power, as does this Court's decision in *Watson v. Pennsylvania Turnpike Commission,* 386 Pa., supra. Moreover, even the majority opinion in this case does not claim that a power of suspension arises from or can be derived from said Act.

It seems to me that the majority has completely overlooked the relevancy and the importance of the requirement in §4 of *removal upon conviction.* From time immemorial in the United States and in England, the principle is imbedded in our law that a man is presumed to be innocent until he is proven guilty. How far the Courts have gone to sustain this immemorial presumption of innocence and to allow removal from office *only upon strict compliance with the Constitution* or a pertinent statute, is apparent from *Kline Township School Directors' Case,* 353 Pa. 91, 44 A. 2d 377; *Davis's Appeal,* 314 Pa. 357, 172 A. 399.

In *Kline Township School Directors' Case,* 353 Pa., supra, Chief Justice MAXEY speaking for a unanimous Court said (pages 95-97) : *"Article VI, Section 4* of the Constitution provides that 'all officers shall hold their offices on the condition that they behave themselves well while in office, and shall be *removed on conviction* of misbehavior in office or of any infamous crime.' This provision applies to school directors as well as to other public officers, and if these respondents are guilty

of the crime of extortion, i.e., taking money illegally under color of their office, or *of conspiracy to defraud the school district,* they should have been proceeded against criminally and *upon conviction* they could have been removed from office.

"This court held in Davis's Appeal, 314 Pa. 357, 172 A. 399, that *a school director could not be removed* by the Court of Common Pleas *upon proof that he had received bribes.* We quoted Section 225 of the School Code as providing specifically that 'any school director who shall . . . receive any money or any other valuable thing for voting for or against . . . any appointment or matter or action that shall come before the board . . . shall be guilty of a misdemeanor, and on conviction thereof shall forfeit his office . . .' *We said this provision was 'exactly the same as the general provision in Article VI, Section 4 of the state Constitution,'* supra. *We added, later in the opinion, that Article VI, Section 4 of the Constitution evidences 'a strong feeling among the people . . . that one accused of crime, shall not be punished in any way therefor unless he shall have been first convicted thereof by a "jury of his peers."'*

"While the School Code *specifically* provides for a school director's removal if convicted of *bribery,* we think this specific provision does not warrant a conclusion that for the crime of *extortion* or of *conspiracy* to defraud the district, school directors may be adjudged guilty by a Court of *Common Pleas* and then removed from office. The use of the phrase 'removed on conviction' in Article VI, Section 4 of the state Constitution requires us to hold that when a school director is charged with any crime, *he cannot be removed from office* for committing that crime until the latter is proved in a court in which crimes are cognizable.

"The provision in Article VI, Section 3 of the Constitution relating to the liability of 'the Governor and

all other civil officers' 'to impeachment for any misdemeanor in office,' and *the provision in Section 4, supra, constitute a mandate from the organic law that for positive acts of misbehavior in office public officials are removable only after their guilt is established either in impeachment proceedings or 'on conviction of misbehavior in office or of any infamous crime.' "*

In the light of these decisions it would seem clear as crystal that the *Governor has no power,* under Article VI, §4, or under any other provision of the Constitution, *to remove* a Turnpike Commissioner who is accused of or indicted for crime *except after impeachment or conviction.*

### Harmonizing Power of Removal (1) at Pleasure and (2) for Cause

We know of no case which has explained, interpreted and harmonized the two provisions in Article VI, §4 which provide for (1) removal of all officers upon conviction of misbehavior in office or of any infamous crime, and (2) removal of appointed officers at the pleasure of the appointing power. It is unnecessary to unravel this knotty problem since its solution is not necessary to a decision in this case, but it would seem they may be reasonably, practically and logically harmonized by applying the provision for *removal at pleasure* to appointments by a Governor (a) of his employees and his Cabinet who, while subject to Senate confirmation, have a term of employment which does not extend beyond that of the incumbent Governor, and (b) of persons with or without a fixed term who do not need to be confirmed by the Senate and whose removal is not otherwise legislatively provided for; and by applying the *provisions for removal* after impeachment or after conviction of misbehavior in office or of any infamous crime, to all other officers (as well as those above mentioned).

### 3. No Autocratic Power of Removal

The majority opinion asserts that the Governor has, under the Constitution, an *inherent power of removal for cause* of officials of legislatively created offices for a term of ten years, appointed by and with the advice and consent of the Senate—that is *of officers whom he cannot remove at pleasure*—because of the Constitutional mandate that he shall "take care that the laws be faithfully executed"\* and because it is unthinkable that such a power would not *be given him.* This assertion of *inherent autocratic power* was similarly made on behalf of the President of the United States but was rejected by the Supreme Court of the United States in the recent celebrated case of *Youngstown Sheet & Tube Company v. Sawyer,* 343 U. S. 579. In that case the President of the United States, in order to avert a strike in the steel mills which "would immediately jeopardize our national defense" seized certain mills, claiming "inherent power" of seizure of property and *removal of officers,* under "the aggregate of his Constitutional powers as the Nation's Chief Executive and the Commander in Chief of the Armed Forces of the United States.", and further that such inherent power was "supported by the Constitution, by historical precedent, and by court decisions". The Court said: "Particular reliance is placed on provisions in Article II which say that 'The Executive Power shall be vested in a President . . .'; that 'he shall take Care that the Laws be faithfully executed'; and that he 'shall be Commander in Chief of the Army and Navy of the United States.'" The Court held that neither these broad provisions nor any other provisions of the Constitution gave the President any such inherent autocratic Power. Justice FRANKFURTER in his Concurring Opinion, said: "It [the

---

\* Article IV, §2.

experience of man] sheds a good deal of light not merely on the need for effective power, if a society is to be at once cohesive and civilized, but *also on the need for limitations on the power of governors over the governed.* . . .

" *'The doctrine of the separation of powers* was adopted by the Convention of 1787, not to promote efficiency but *to preclude the exercise of arbitrary power.* The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, *to save the people from autocracy.'* . . ."

Our Country was founded by people who fled from autocracy, imperialism and totalitarianism to establish the Land of the Free. The history of every community, colony, and state in this nation is replete with our innate and vigorously expressed opposition to autocratic power of Government and to any enlargement of executive power. This opposition and abhorrence of autocratic power is mirrored and strikingly portrayed in our Declaration of Independence and our Constitution. Ours is a Republican* form of Government which is divided into three major divisions, the Executive, the Legislative, and the Judicial. None of them possess autocratic powers; each possesses only those limited powers which are expressly or by clear and necessary implication granted to them. If there be any reasonable doubt, such doubt—under our philosophy and Form of Government—must be resolved against a claim of autocratic power. Our Constitutional Government, with its checks and balances and limitations, plus the freedoms and unalienable rights ordained and guaranteed to the people of the United States in our wonder-

---

* Article IV, §4, of the Constitution of the United States.

ful Constitution,* and all the other rights which have been reserved to and preserved *for the people*, have enabled us, in the short space of 150 years, to become the greatest nation in the world. These fundamental basic rights must be maintained and preserved for the people of this country untrammeled, unrestricted and uncurtailed by encroachment or usurpation by the Executive or by the Legislature. Whether the Executive be President or Governor, he possesses no autocratic powers—no power of seizure or removal—except what is specifically or by clear and necessary implication given him by the Constitution, or Constitutionally given him by Congress or the Legislature. Cf. *Youngstown Sheet and Tube Company v. Sawyer*, 343 U. S., supra; *Watson v. Pennsylvania Turnpike Commission*, 386 Pa., supra.

Any absolute or arbitrary or autocratic inherent or implied power of removal by the Governor for what he deems "reasonable cause", except the three causes which are *specifically* enumerated and granted in Article VI, §4, finds no support in any provision of the Constitution and cannot and should not be sustained!

The majority's grant to the Governor of ungranted power completely changes the nature and character of independent agencies of Government and makes them merely a submissive puppet branch of the Executive. What kind of just, impartial and independent action or decision can be expected when a Damocletian sword of obedience or death, hangs suspended over each anxious head? Furthermore, any ungranted power of removal for cause would often produce gross and irreparable injustice, as for example, where a public official, re-

---

\* Which was described by the great English statesman, William Gladstone, as "the greatest piece of work ever struck off at a given time by the brain and purpose of man"; and of which that other illustrious English statesman, William Pitt, said "It will be the wonder and admiration of all future generations".

moved because of being charged with a crime, is acquitted of the crime.

The majority's theory of autocratic *inherent power of removal* makes a mockery of the Legislative language and Legislative intent, it makes independent agencies of Government mere puppets, it can produce gross and irreparable injustice, it violates the clear specific provisions of Article VI, §4 of the Constitution, and equally important, it negates the basic philosophy of our Country and is diametrically opposed to the fundamental principles of our Form of Government. Needless to say, I am vehemently opposed to such a Procrustean extension of the Constitution and to such a deplorable, disastrous and historically unAmerican result.

### 4.  Temporary Suspension

A temporary suspension is a much lesser penalty than *removal* from office. In the practical world in which we live, where Government has to maintain law and order and function honestly and efficiently or our Republican Form of Government cannot long survive, it is absolutely essential that a power of *temporary suspension* must exist in some supervising officer in cases of infamous crimes and very serious offenses which relate to and directly and seriously affect the performance of official duties or the functioning of the office in question, or are reasonably likely to endanger the persons connected therewith. This inherent power of suspension, which is temporary, is a far cry from the Power of Removal, which is drastic and final. Although neither Constitutionally nor statutorily granted, it was specifically recognized and sustained in *Kaplan v. Philadelphia School District,** 388 Pa., supra. This

---

* In that case we affirmed a suspension of a school teacher by a superintendent of schools who had no power of removal (which by statute was vested in the Board of Education).

inherent right or power of temporary suspension is obviously a necessary, but equally obviously, a dangerous power; it may never be exercised for political reasons, or for minor offenses, or for crimes or offenses which do not very seriously and directly affect the functioning of the office in question or are such as are reasonably likely to endanger the persons connected with such office. For example, a teacher who is accused of obscenity or immoral conduct in the classroom, or of maniacal insanity, or an appointed public official who is indicted for murder, robbery, arson, treason, or advocating Communism,* may be temporarily suspended by his superior officer under the inherent power of suspension above mentioned. On the other hand, a power of temporary suspension would not exist or be applicable merely because a public official such as a Turnpike Commissioner was indicted for assault and battery, or slander (of a subordinate or other person) or adultery, or fraudulent conversion of a chair or stamps which are the property of the Department.

Applying this fundamental basic *inherent principle of suspension* to the instant case, the Governor of Pennsylvania, in my judgment, in order that Government may properly, honestly and efficiently function—and without violating any law or provision of the Constitution—has the *inherent* power to temporarily *suspend* a member of the Turnpike Commission where he has reasonable and probable cause,—for example, after admission of or refusal to deny guilt, or after indictment —to believe that an infamous crime or a very serious offense has been committed by the person in question which directly and very seriously affects the perform-

---

* A barbarically brutal, atheistic, ruthless dictatorship, one of whose principal purposes and objectives is the overthrow of every other government in the world and the subjugation of all peoples by sabotage, subterfuge and force.

ance of his official duties or the functioning of the office which he holds, or is reasonably likely to endanger the persons connected therewith. Is this principle applicable to the facts in the instant cases?

James F. Torrance was indicted for corruptly participating, as a member of the Turnpike Commission, in the negotiation of a contract with Manu-Mine and Development Company for the payment of vast sums of money, in violation of numerous mandatory statutory provisions, and without the safeguards required by law. Torrance denied the charges.

G. Franklin McSorley was indicted for corruptly allowing Daniel J. Dalte, an employe of the Pennsylvania Turnpike Commission, to work exclusively for Thomas J. Evans, former Chairman of the said Commission, from July 1, 1955, to March 1, 1956, when he was receiving from the Turnpike Commission wages of $2800. McSorley's explanation, if believed, would absolve him from any crime whatsoever. However, the offense charged in the indictment of McSorley certainly does not amount to an infamous crime or a highly serious offense which very seriously affects the functioning of the office of the Turnpike Commission or is reasonably likely to endanger the persons connected therewith. It follows that the indictment and the facts alleged to constitute the offense furnish no ground or support, either in the Constitution or under the principles of law hereinabove enunciated, for the suspension of McSorley.

I concur in the decision of the majority of the Court that the facts alleged in the bill of indictment, but of course unproved, against James F. Torrance so very seriously and directly affect the functioning of the office which he holds as to justify his temporary suspension by the Governor. That temporary suspension could exist only for a reasonable time and would of

course terminate upon Torrance's acquittal, or prior thereto, if grounds justifying the suspension were found not to exist.

For the reasons hereinabove set forth, I dissent from that part of the majority's decision which sustains the suspension of McSorley; and I particularly and strongly dissent from the reasoning upon which the majority base the Governor's power of suspension.

Mr. Justice BENJAMIN R. JONES joins in this concurring and dissenting opinion.